## WEIGLE v. ROLLER.

(Court of Appeals of District of Columbia. Submitted January 9, 1924. Decided February 5, 1924.)

### No. 3973.

1. **Appeal and error ⊚⟹273(6)—Exception to charge, so far as inconsistent with prayers, insufficient.**

An exception to the charge, so far as it was inconsistent with the excepting party's prayers, was too indefinite to save any questions touching the correctness of the charge, as an exception must point out specifically the proposition of law objected to.

2. **Appeal and error ⊚⟹927(7)—Testimony viewed favorably to appellee.**

On review of an exception to the refusal of a charge to return a verdict for appellant, the testimony must be viewed from the angle most favorable to appellee.

3. **Partnership ⊚⟹21—Evidence held to warrant finding that plaintiff had not abandoned contract to purchase business.**

In an action for breach of contract for the joint purchase of a business by plaintiff, defendant, and another, evidence *held* to warrant finding that plaintiff had not abandoned his contract with owner prior to defendant's secret purchase of the business from owner.

4. **Partnership ⊚⟹21—Evidence held to support recovery for breach of contract to purchase business jointly.**

In an action for breach of a contract for the joint purchase of a business by plantiff, defendant, and another, evidence *held* to support a recovery for $7,000.

5. **Partnership ⊚⟹21—Partnership agreement between defendant and another admissible in action for breach of partnership agreement with plaintiff.**

In an action for breach of a contract for the purchase and operation of a business by plaintiff, defendant, and another, *held,* that a partnership agreement between defendant and another for the purchase of the business was admissible to show that defendant had prevented plaintiff from performing the contract in action.

6. **Partnership ⊚⟹21—In action for breach of agreement to form partnership, evidence of profit made by defendant and another admissible.**

In an action for breach of a contract for the purchase and operation of a business by plaintiff, defendant, and another, evidence of the profit made by defendant and another out of the business *held* admissible.

---

⊚⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the Supreme Court of the District of Columbia.

Action by Harry Roller against William E. Weigle. Judgment for plaintiff, and defendant appeals. Affirmed.

See, also, 49 App. D. C. 102, 261 Fed. 250.

Paul E. Lesh, of Washington, D. C., for appellant.

A. L. Newmeyer and M. W. King, both of Washington, D. C., for appellee.

Before SMYTH, Chief Justice, VAN ORSDEL, Associate Justice, and SMITH, Judge of the United States Court of Customs Appeals.

SMYTH, Chief Justice. This is an appeal from a judgment of the Supreme Court of the District of Columbia in favor of Harry Roller and against William E. Weigle. Weigle, Roller, and one Schumacher, on the 30th of January, 1918, entered into a written contract, which recites that one Huske, the sole owner of all the capital stock (100 shares) of the Huske Optical Company, a corporation, had offered to sell the same at a price to be ascertained either by agreement or by an inventory of the stock in trade and fixtures belonging to the corporation. Weigle was to receive 50 shares of the stock, Roller 40, and Schumacher 10. Weigle, if necessary, was to loan Roller and Schumacher the sum required to pay for their respective shares, and to take their respective notes for the loan, with their stock as collateral. It was also provided that Roller should be managing director of the corporation, with a weekly drawing account of $50, and Weigle, supervising director, with a weekly drawing account of $25, and that each of the shareholders should receive his proportionate share of the net profits. There was a further provision to the effect that Roller and Schumacher would at each dividend paying period pay on account of their indebtedness to Weigle the entire amount of dividends received by them, and so continue until the indebtedness had been paid, and that Weigle should be president, Schumacher vice president, and Roller secretary-treasurer, of the corporation, at salaries to be fixed at each meeting of the corporation before the dividends should be declared.

On the next day, January 31st, Huske, the owner of the stock, gave a receipt to Roller, in which he acknowledged the sum of $1,000 by the check of Weigle, as part payment of the purchase price of the stock, and recited the conditions of the sale, viz.: That an inventory was to be taken of the stock, fixtures, and machinery; the stock was to be sold at the jobber's price, less 6 per cent. discount for cash, "that is to say, at the factory list price as of the date of the taking of the inventory"; the fixtures at the price paid, machinery at the net cost to the vendor, and payment to be made upon the indorsement and delivery of the certificates of stock. The receipt was signed by Huske, and the terms assented to in writing by Roller as purchaser.

It appears that factories which manufacture optical instruments issue a price list, and that the jobber is supposed to sell at that price to the optician, less 6 per cent. discount if he pays within a certain time. The price, however, which the jobber pays to the manufacturer is one-third less than the factory price.

At the time the receipt just mentioned was signed it was believed by all the parties concerned that the amount of the stock in trade was worth about $8,000 or $10,000. The inventory was proceeded with, and it soon became evident that the stock was much larger than anticipated. Weigle, when informed of this by Roller, said, after some conference, "Well, you go ahead and finish up, and I will raise the money." A short time afterwards Weigle said to Roller that he was having some difficulty in getting the necessary money, that the person from whom he expected to get it thought he should have a controlling interest in the business, that under the agreement which then existed between him, Roller, and Schumacher he did not have that control, and suggested that, if Roller would consent to take 33 shares and Schumacher would relinquish his portion, he (Weigle) could get the deal through. In the meantime Roller reminded Huske that the inventory was running higher than he had expected, to which Huske replied that it was much larger than he had looked for, and that in view of this he would let Roller have the property at the jobber's price, or one-third less than the agreed purchase price. Huske's statement was made known to Weigle by Roller, but Weigle showed indifference, and said, "I don't believe he would do that." However, on the 11th of February a supplemental agreement was made between Weigle, Roller, and Schumacher, in which it was recited that the purchase of the stock was made upon the assumption that it was worth approximately $8,000, whereas it had developed that it was worth much in excess of that, and that this necessitated the raising of additional capital to enable the purchase to be made, and it was agreed that the provision of the first contract between the parties for a division of the stock among them should be annulled and another provision substituted, whereby Weigle was to receive 66 shares, Roller 33, and Schumacher 1; that in all other respects the contract of January 30th was to remain in force.

When the inventory was completed, it was found, Roller says, that the amount of the purchase price required, according to the written agreement between himself and Huske, would be between $33,000 and $34,000, but that if the stock was figured on the basis of Huske's oral proposition to take one-third less than the agreed purchase price it would be in the neighborhood of $21,000. Weigle and Roller met Huske for the purpose of closing the deal. When Roller reminded Huske of his proposition to take one-third less than the contract price, Huske made no response, but referred him to his attorney. Roller was surprised by this apparent change of front on the part of Huske, and he suggested to Weigle that they examine the figures of the inventory, that possibly there was a mistake, and he started to do so, when Weigle grabbed the book and threw it on the case, saying:

"Those gentlemen are careful enough. There is no use of my going over the figures. I believe everything is all right."

Weigle and Roller went out to lunch. While there Weigle said, "They won't take anything like that," referring to the reduced price. "They have us hooked. I suppose I am $1,000 out."

They soon resumed their conference with Huske, to whom Roller said that they could not take the stock on the basis of the written agreement, but that they were ready to take it on the basis of one-third off. Huske refused to make any answer, but his attorney replied:

"Morally you are right, but when you come to legally it is a different proposition."

Thereupon Weigle and Roller started away. Huske followed them, put his arms around Roller and said:

"You know I am a sick man. Give me a chance to think it over. I will write to you in two or three days. It want to do the right thing."

To which Roller replied, "All right, we can wait," and left with Weigle.

Huske did not write to Roller as agreed. For some days Roller was unable to get in touch with Weigle, although he tried on several occasions to do so. On the 18th or 19th of February, a short time after the conference just referred to, Weigle personally applied to Roller for the receipt which the latter had received from Huske for the $1,000 paid on the contract of purchase of January 31, saying he was going to Panama and wanted his receipt for the $1,000. Roller refused to give it. Later Roller learned for the first time that, on the day before, Weigle and one Sime had entered into a contract with Huske to purchase the capital stock, stock in trade, etc., at $20,000, about $1,000 less than Roller was willing to pay for it.

Soon thereafter this action was instituted by Roller, in which he claims that Weigle breached his contract; that he, Roller, was always able, ready, and willing to perform his part of the contract; and asks for damages. At the close of all the testimony Weigle requested the court to charge the jury that it should return a verdict in his favor, and, that request having been refused, he asked an instruction to the effect that, if the verdict was for the plaintiff, it should be for nominal damages only. This request was also refused.

The court submitted the case to the jury upon the theory that Weigle and Roller were partners; that this relation implied confidence between them; that each had a right to trust the other with respect to the purchase of the business; that each was entitled to all the information the other had while the contract was in force between them; that, if a saving could be made, each was entitled to his share of what was saved, and that neither was at liberty to make any secret arrangement with Mr. Huske while the contract remained in force; and charged that the principal point of dispute between the parties was as to whether or not Roller had made known to Weigle and Huske that the contract would not be carried out by him, and that he had abandoned it, and that, if Roller had done so, it would be a good defense to the action. The court further charged that, if the defendant Weigle made a secret arrangement with Huske which resulted in Huske's refusing to sell the property for the sake of accommodating Weigle, while the contract between Weigle and Roller was in force, it was a violation of Weigle's duty to Roller under the circumstances.

No exception was taken to the charge by Roller. Weigle excepted in so far as it was "inconsistent with said prayers," meaning the two requests above referred to. There was a verdict for the plaintiff, upon which judgment was entered.

[1] The exception to the charge by Weigle was too indefinite to save any questions touching its correctness for our consideration. An exception, to be valid, must point out specifically the proposition of law objected to. Guerini Stone Co. v. Carlin Construction Co., 248 U. S. 334, 348, 39 Sup. Ct. 102, 63 L. Ed. 275; Washington & Old Dominion Railway v. Slyder, 43 App. D. C. 95; Traver v. Smolik, 43 App. D. C. 150. This, however, does not preclude us from considering the action of the court in rejecting the two prayers offered by Weigle, proper exceptions having been reserved.

[2] In passing upon the first exception we must, of course, view the testimony from the angle most favorable to Roller. Thomas R. Riley Lumber Co. v. McHarg, 47 App. D. C. 389. We have observed this principle in making the foregoing statement of facts.

[3] It is manifest that Weigle did not perform his contract. About this there is no room for doubt. He asserts, however, that Roller was not ready to perform his part of the contract, but, instead, had abandoned the contract. If this is true, the instruction requested should have been given. It will be remembered that Weigle was not a party to the contract between Huske and Roller. But the contract between Roller, Weigle, and Schumacher could not be carried out unless the contract between Huske and Roller was performed. It was by that means that the stock which was to be distributed between Roller, Weigle, and Schumacher was to be procured. Therefore, if Roller abandoned his contract with Huske, he would thereby render impossible the performance of his contract with Weigle and Schumacher, and, of course, could not in those circumstances complain because Weigle had not performed—had not done what he had prevented him from doing. From this it follows that, if Weigle's contention is correct that Roller abandoned his contract with Huske, that would be a good defense on Weigle's part.

Roller at first said to Huske that he was not willing to pay more than $21,000 for the stock, or about two-thirds of the inventory value, which was the price paid by Huske as a jobber for the goods. Huske, according to Roller, had indicated his willingness to sell at that price, but later did not seem inclined to do so. Thereupon Roller said that it was out of the question for him to take the property at the inventory or factory list price, but that he would take it at the lower figure. To this Huske responded:

"You know I am a sick man. Give me a chance to think it over. I will write to you in two or three days. I want to do the right thing."

Roller answered, "All right, we can wait." Thus the matter was left open by mutual consent. Within a few days thereafter Weigle and Huske came together without Roller's knowledge and made a contract by which Huske put it out of his power to sell the stock to Roller. The latter's failure to perform was due to Weigle's secret contract, made in violation of his duty as a partner, and Weigle will

not be permitted to take advantage of his own wrong to defeat Roller's claim. So far as being ready to perform the contract is concerned, nothing was required of Roller until the stock had been delivered to him, Weigle, and Schumacher, and he says that, if it had been delivered, he would have been ready to proceed. We think this testimony warranted the jury in finding that Roller had not abandoned the contract between himself and Weigle, or the one between him and Huske, and hence there was no error in refusing the request.

[4] With respect to the measure of damages, there was testimony tending to show that the business was worth $60,000, that the value of the one-third interest in the business, which Roller would have received if the contract had been carried out, would be about $20,000. For this interest he would be required to pay one-third of $34,000, or about $11,333. This, deducted from $20,000, would leave a profit of $8,667, which he lost by the breach. The jury returned a verdict for $7,000. We think it was warranted in doing so, and, a fortiori, this would be true if the amount of the purchase price was $20,000, that for which Weigle got the property, instead of $34,000. The contention of appellant that the contracts declared on were, so far as Roller is concerned, essentially contracts for the rendition of personal service by him, is obviously unsound. While that element was in the case, it is clear that the one which we have just discussed was also in it. Evidently the jury did not allow Roller anything on the score that he had been deprived of the salary which he would have earned as managing director and secretary-treasurer. The second prayer was properly denied.

[5, 6] It is contended that the contract between Weigle and Sime was improperly admitted in evidence. We think it had a tendency to show that Weigle had prevented Roller from performing the contract in action. The testimony as to the profits made by the business after Weigle and Sime had purchased it had a bearing upon the value of the business, and there was no error in admitting it.

In our judgment it is not necessary to here analyze the other assignments of error. Let it be sufficient to say that we have considered them carefully, and we find them to be without merit.

The judgment of the lower court is affirmed, with costs.

Affirmed.

Motion for reargument denied February 16, 1924.